UNITED STATES BANKRUPTCY COURT                           NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x
*In re:*                                          :        Case No. 16-13164 (JLG)
                                                  :
                                                  :        Chapter 7
Level 8 Apparel LLC, *et al.*,                    :
                                                  :
                                Debtors.[1]       :
                                                  :
-------------------------------------------------------- x

### MEMORANDUM DECISION AND ORDER ADDRESSING OBJECTIONS TO FEE APPLICATION AND CHAPTER 7 TRUSTEE'S MOTION TO COMPEL AND MOTION FOR DISGORGEMENT

**A P P E A R A N C E S :**

RUTA SOULIOS & STRATIS LLP
*Attorneys for the Debtor*
211 East 43rd Street, 24th Floor
New York, New York 10017
<u>By:</u>    Steven A. Soulios, Esq.

KLG LUZ & GREENBERG LLP
*Attorneys for Ruta Soulios & Stratis LLP*
211 East 43rd Street, 24th Floor
New York, New York 10017
<u>By:</u>    Thomas J. Luz, Esq.

ANGELA TESE-MILNER
THE LAW FIRM OF TESE & MILNER
*Attorneys for the Chapter 7 Trustee*
735 Wickham Avenue
P.O. Box 35
Mattituck, New York 11952
<u>By:</u>    Angela Tese-Milner, Esq.

---

[1]    The last four digits of Level 8 Apparel LLC's tax identification number are 0220. The location of Level 8 Apparel LLC's services address for purposes of this Chapter 7 Case is: 202 West 40th Street, Suite 1101, New York, NY 10018.

BORG LAW LLP
*Attorneys for Weihai Textile Group Import & Export Co., Ltd.*
370 Lexington Avenue, Suite 800
New York, New York 10017
By:    Jonathan M. Borg, Esq.

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
201 Varick Street, Room 1006
New York, New York 10014
By:    Greg M. Zipes, Esq.

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

## **Introduction**[2]

Ruta Soulios & Stratis LLP ("RSS") served as bankruptcy counsel to Level 8 Apparel LLC

("Level 8") and World Cross Cultures, Inc. ("WCC",[3] and together with Level 8, the "Debtors"),

an affiliate of Level 8, in their Chapter 11 Cases. Approximately eighteen months after the Petition

Date, the Court granted the Office of the United States Trustee's (the "UST") motion pursuant to

section 1112 of title 11 of the United Sates Code (the "Bankruptcy Code") to convert the

Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. Thereafter, the Chapter 7

Trustee took possession and control of the Debtors, their estates, and their assets. At that point,

RSS ceased representing the Debtors.[4]

---

[2]    Capitalized terms not defined in the Introduction have the meanings ascribed to them herein.

[3]    WCC is a non-operating entity to whom RSS provided minimal services. For that reason, in reviewing this matter, the Court focuses on the services that RSS provided to Level 8, to the exclusion of WCC.

[4]    These cases are being jointly administered under Case No. 16-13164. References to "ECF No. __" are references to the electronic docket in the jointly administered cases. References to "Case No. 16-13166, ECF No. __" are references to the electronic docket in the WCC chapter 11 case. References to "AP No. __, ECF No. __" are references to the electronic docket in the identified adversary proceeding.

The matters before the Court are the Second Interim Application and Final Fee Application of RSS (together, the "Fee Application") as former counsel to the Debtors. In the Fee Application, RSS seeks the following:

- Interim allowance of compensation for professional services rendered, and reimbursement for actual and necessary expenses incurred in connection with such services for April 16, 2017, through August 22, 2018 (the "Second Interim Fee Period") totaling $39,990.13 and comprised of fees for services rendered to the Debtors during the Second Interim Fee Period in the amount of $34,272.00 (consisting of fees of $29,102.00 incurred from April 16, 2017, through July 27, 2018, and fees of $5,170.00 incurred from July 27, 2018, through August 22, 2018 (the latter, the "Supplemental Fee Period")), expenses incurred in connection with the rendition of such services in the amount of $27.83, and payment of the 10% holdback, in the amount of $5,691.00, implemented in connection with RSS's First Interim Fee Application; and

- Final allowance of compensation for professional services rendered and reimbursement of actual and necessary expenses incurred from November 16, 2016, through August 22, 2018 (the "Final Fee Period") totaling $94,897.48 and comprised of fees for services rendered to the Debtors during the Final Fee Period in the amount of $91,175.00 and expenses incurred in connection with the rendition of such services in the amount of $3,722.48.

The Debtors commenced the Chapter 11 Cases in the wake of the entry of a judgment against them severally in the sum of $1,892,777.96, in an action brought by Weihai Textile Group Import & Export Co., Ltd. ("Weihai") against them and Scott Kim a/k/a Seung Bong Kim a/k/a Sam Kim (hereinafter "Sam Kim"), a Director of Level 8, in the United States District Court for the Southern District of New York (the "Weihai Litigation").[5] RSS represented the Debtors and Sam Kim in that litigation.

On Five Corporation ("On Five") is the source of the $70,000 Retainer that the Debtors paid to RSS in connection with its retention as bankruptcy counsel. On Five is an insider of the Debtors that received transfers from the Debtors—apparently for no consideration—aggregating

---

[5]    *See* Order and Judgment, *Weihai Textile Grp. Import & Export Co., Ltd. v. Level 8 Apparel LLC*, No. 11-cv-4405 (S.D.N.Y. Sept. 26, 2016), ECF No. 214.

approximately $580,000 (the "On Five Transfers") eight months prior to the Petition Date. Sam Kim's wife, Kuk Ja Kim, owns 100% of Level 8's membership interests. The Statement of Financial Affairs that Level 8 filed with its Petition (the "Level 8 SOFA")[6] discloses that during the 90-day period immediately prior to the Petition Date (the "90-day Period"), Level 8 made payments to Sam Kim and his wife totaling approximately $234,000 on account of pre-petition indebtedness. The Debtors' General Ledger shows transfers by Level 8 to Kim and his wife totaling approximately $350,000.

The Chapter 7 Trustee, the UST, and Weihai oppose the Fee Application, although the Chapter 7 Trustee has borne the laboring oar in that opposition. The Chapter 7 Trustee complains that in pursuing the Retention Application, RSS violated sections 327 and 329 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Rules"), because, among other things, it failed to disclose both that it represented Sam Kim in the Weihai Litigation, and that On Five is an insider of the Debtor. She also complains that during its tenure as Debtors' counsel, RSS did not pursue, or even investigate, potential avoidance or damage claims against Sam Kim, his wife, and On Five. The Chapter 7 Trustee contends that the Court should disqualify RSS as Debtors' counsel, deny the Fee Application, and direct RSS to disgorge the compensation paid to date. She also joins Weihai in arguing that the services for which RSS seeks compensation did not benefit the Debtors and their estates and, as such, RSS should not be compensated for those services. Finally, she maintains that the Retainer is property of Debtors' estates, the Debtors are administratively insolvent, and that by application of the chapter 7 priorities under section 726(b)

---

[6]    *Official Form 207: Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy*, ECF No. 20, Item 11.1.

of the Bankruptcy Code, the Court should direct RSS to turn over the Retainer to her to be applied first to satisfy the allowed administrative priority claims in the chapter 7 cases.

In response to the Fee Application, the UST filed a "limited objection" and a "reservation of rights." In the latter, the UST focuses on RSS's failure to disclose its connections to the Debtors' insiders in the Soulios Rule 2014 Declaration. The UST notes that under Rule 2014, RSS must disclose to the Court "all connections" to the Debtors that are not so remote as to be *de minimis*. The UST asserts both that RSS has a heavy burden to explain why it failed to disclose all such connections herein, and that, in cases like this one, the sanctions that courts have imposed for counsels' failure to make adequate Rule 2014 disclosures include disqualification, disgorgement of fees paid, and/or denial of fees sought. However, the UST does not seek specific relief in response to the Fee Application.

RSS denies that it has run afoul of the disclosure requirements under the Bankruptcy Code and Rules. It asserts that the services it provided to the Debtors were valuable, beneficial, and necessary, and that the Court should approve the Fee Application in full. It also maintains that there are no grounds to disqualify it as counsel, to direct it to disgorge the fees that it has been paid to date, or to direct it to turn over the Retainer. It contends that the Court should overrule the objections to the Fee Application, deny the Chapter 7 Trustee any of the affirmative relief she is seeking, and approve the Fee Application, including authorizing RSS to credit the Retainer Balance as partial payment of the fee.

As explained herein, the Court finds that RSS violated the disclosure requirements under Rule 2014 and section 329 of the Bankruptcy Code in failing to disclose its relationships with Sam Kim, his wife, and On Five. Moreover, the Court finds that the Retainer is property of the chapter 7 debtors' estates. The Court denies the Chapter 7 Trustee's request to disqualify RSS, but it will

impose sanctions on RSS for its failure to meet the disclosure mandates of the Bankruptcy Code and Rules. At present, the chapter 7 estates are administratively insolvent, and the Chapter 7 Trustee has much work to do to fully administer and wind up the estates. It is premature for the Court to consider the merits of the Fee Application (including whether RSS adequately investigated Debtors' transactions with its insiders), to award additional interim fees, or to consider the appropriate sanctions for RSS's disclosure violations. Moreover, pending the winding up of the chapter 7 cases, the Court defers further consideration of the Chapter 7 Trustee's request for an order directing RSS to disgorge the fees that it has been paid to date and to turn over the Retainer.

### Jurisdiction

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Background

On November 14, 2016 (the "Petition Date"), Level 8 and WCC commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.[7] On January 5, 2017, the Debtors filed an application to employ RSS as bankruptcy counsel *nunc pro tunc* to the Petition Date, pursuant to sections 327(a), 328(a) and 330 of the Bankruptcy Code (the "Retention Application").[8] On February 3, 2017, the Court entered an order approving the Retention

---

[7]    *See Level 8 Voluntary Petition for Non-Individuals Filing for Bankruptcy*, ECF No. 1 (the "Level 8 Petition"); *WCC Voluntary Petition for Non-Individuals Filing for Bankruptcy*, Case No. 16-13166, ECF No. 1.

[8]    *Debtors' Application for an Order Pursuant to 11 U.S.C. §§ 327(a) and 329, Fed. R. Bankr. P. 2014 and 2016, and S.D.N.Y. LBR 2014-1 and 2016-1 Authorizing Employment and Retention of Ruta Soulios & Stratis LLP as Bankruptcy Counsel Nunc Pro Tunc to the Petition Date*, Case No. 16-13166, ECF No. 26.

Application and authorizing the Debtors to retain RSS as their bankruptcy counsel (the "Retention Order").[9]

By orders dated August 22, 2018 (the "Conversion Orders"),[10] the Court granted the UST's motion pursuant to section 1112(b)(4) of the Bankruptcy Code to convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.[11] On August 22, 2018, Angela Tese-Milner, Esq., was appointed as the chapter 7 trustee for the Debtors' estates (the "Chapter 7 Trustee").[12] As of the date of the entry of the Conversion Orders, RSS had filed its Second Interim Fee Application[13] with the Court. On the heels of the conversion of the Chapter 11 Cases, RSS filed a Supplemental Application[14] (i) to include a request for compensation for services rendered during the Supplemental Fee Period, and (ii) to "convert" the Second Interim Fee Application to the Final Fee Application.

**The Fee Application**

As disclosed in the Retention Application, RSS received a $70,000 retainer (the "Retainer")[15] from the Debtors in connection with its representation of the Debtors herein. The Debtors did not fund the Retainer. Rather, On Five, a non-debtor affiliate of Level 8, paid the

---

[9]    *Order Granting Application to Employ Ruta Soulios & Stratis LLP as Debtors' Attorney*, ECF No. 35.

[10]    *Order Converting [Level 8] Chapter 11 Case to Chapter 7*, ECF No. 125; *Order Converting [WCC] Chapter 11 Case to Chapter 7*, ECF No. 21 [No. 16-13166].

[11]    *Motion to Convert Chapter 11 Case to Chapter 7, or in the Alternative, Motion to Dismiss Case*, ECF No. 116.

[12]    *Notice of Appointment of Trustee Angela Tese-Milner*, ECF No. 127.

[13]    *Application of Ruta Soulios & Stratis LLP for a Second Interim Award of Compensation for Services Rendered and Reimbursement of Expenses as Counsel for the Debtors for the Period of April 16, 2017 Through July 27, 2018*, ECF No. 113.

[14]    *Supplemental Filing of Ruta Soulios & Stratis LLP Seeking (I) to Convert Second Interim Fee Application to a Final Fee Application and (II) Supplement Amount of Fees Sought to Include Time Expended After the Filing of the Second Interim Application*, ECF No. 136.

[15]    The Debtors' agreement to pay the Retainer is set forth in the Engagement Letter, which is annexed as Exhibit 1 to Exhibit A of the Retention Application.

Retainer to RSS.[16] On April 20, 2017, RSS filed its First Interim Fee Application[17] for interim

allowance of compensation for professional services rendered and reimbursement for actual and

necessary expenses incurred in connection with such services for the period of November 4, 2016,

through April 15, 2017 (the "First Interim Fee Period"), totaling $60,597.65 and comprised of fees

for services rendered to the Debtors during that period in the amount of $56,903.00 and associated

out-of-pocket expenses totaling $3,694.65. The First Interim Fee Application was unopposed. The

Court approved the First Interim Fee Application, and on August 31, 2017, the Court entered an

order (the "First Interim Fee Order")[18] awarding RSS $56,903.00 in fees and $3,694.65 in expenses

for the First Interim Fee Period. The Court awarded the fees subject to a holdback in the amount

of $5,691.00 and authorized RSS to credit the Retainer for the fees and expenses awarded in the

First Interim Period (less the holdback). *See* Retention Order ¶ 5. The balance of the Retainer totals

$15,093.35 (the "Retainer Balance").

During the Second Interim Fee Period, RSS incurred $27.83 in out-of-pocket expenses for

which it seeks reimbursement, and its attorneys and paraprofessionals expended a total

of 81.45 hours, including 11.75 hours during the Supplemental Fee Period, for which RSS seeks

compensation. The blended hourly rates during these periods are $440 for attorneys and $150 for

paraprofessionals. The Fee Application discloses that during the Second Interim Fee Period, the

services that RSS provided to the Debtors included:

- Negotiating with Capstone Capital Group LLC ("Capstone") concerning continued performance under the Debtors' exclusive sales representative agreement with Capstone and Capstone's continued financing of Debtors' production of outerwear

---

[16]   *See* Level 8 SOFA, Item 11.1.

[17]   *See Application of Ruta Soulios & Stratis LLP for a First Interim Award of Compensation for Services Rendered and Reimbursement of Expenses as Counsel for the Debtors*, ECF No. 48.

[18]   *Order Granting Application for Allowance of Interim Compensation and Reimbursement of Expenses*, ECF No. 65.

garments (for sale to Costco) during post-petition period. Second Interim Fee Application ¶ 11.[19]

- Advising Debtors regarding proposed exit financing with Capstone, including preparation of several term sheets. *Id.* ¶12.

- Reducing the prepetition secured claim of the Internal Revenue Service from $422,259 to approximately $210,000. *Id*. ¶ 16.

- Reducing the priority claim of the New York City Department of Tax and Finance's by $544,535 to an amended amount of $28,465. *Id*. ¶¶ 17-19.

- Consulting with Debtors' prepetition litigation counsel concerning status of certain claims against Debtors in a case (the "State Court Case") that had been tried in the Supreme Court for the State of New York, Nassau County. *Id*. ¶ 20.

- Reviewing pleadings made in connection with the State Court Case and negotiating a stipulated limited vacatur of the stay to permit the trial court to liquidate said claims. *Id*.

- Securing and maintaining the stay of the pending appeal of the Weihai Judgment at the Second Circuit Court of Appeals. *Id*. ¶ 21.

- Engaging in a preliminary claim register analysis and reporting to the Court concerning the same. *Id.* ¶ 22.

- Negotiating a stipulation with Capstone, the UST and Weihai regarding the production of documents to the UST concerning the Debtors' relationship with Capstone and Costco Wholesale. *Id*. ¶ 23.

- Since April 2017, regularly preparing and filing status reports and attending status conferences before the Court. *Id*. ¶ 24.

**The Responses to the Fee Application**

The following responses to the Fee Application have been filed:

- Weihai filed an objection to the Second Interim Fee Application (the "Weihai Objection");[20]

---

[19]    The nature of the relationship among Level 8 and Capstone is unclear and is the subject of two lawsuits that the Chapter 7 Trustee is pursuing herein. *See Tese-Milner v. Kim, et al. (In re Level 8 Apparel, LLC)*, No. 19-01335 (Bankr. S.D.N.Y.); *Tese-Milner v. Capstone Credit, LLC, et al.*, No. 20-01208 (Bankr. S.D.N.Y.). Nothing herein should be construed as a finding by the Court regarding any aspect of the relationship among those parties.

[20]    *Objection by Weihai Textile Group Import & Export Co., Ltd. to the Application of Ruta Soulios & Stratis LLP for Award of Compensation for Services Rendered and Reimbursement of Expenses*, ECF No. 119.

- The UST filed a limited objection (the "UST Limited Objection")[21] and a reservation of rights (the "UST Reservation of Rights")[22] with respect to the Second Interim Fee Application; and

- The Chapter 7 Trustee filed (i) a motion (the "Motion to Compel")[23] in which she objects to the Second Interim Fee Application and seeks to compel RSS to turn over the Retainer and (ii) a supplement to the Motion to Compel, seeking an order disqualifying RSS, denying RSS additional compensation and directing RSS to disgorge the fees and expenses paid pursuant to the First Interim Fee Order (the "Motion for Disgorgement").[24]

RSS filed the following responses to the foregoing and in further support of the Fee Application:

- A response to the Weihai Objection and the UST Limited Objection (the "Initial Response");[25]

- A response to the Motion to Compel (the "Response to Motion to Compel");[26]

- A response to the Motion for Disgorgement (the "Response to Motion for Disgorgement");[27] and

- A memorandum of law in support of the Fee Application (the "RSS Memorandum").[28]

---

[21]  *Limited Objection of the United States Trustee to the Second Interim Application for Approval and Payment of Compensation and Expenses to Ruta Soulios & Stratis LLP*, ECF No. 121.

[22]  *Reservation of Rights of the United States Trustee in Connection with the Application for Approval and Payment of Compensation and Expenses to Ruta Soulios & Stratis LLP*, ECF No. 188.

[23]  *Chapter 7 Trustee's Motion for Turn-Over of Retainer Balance, Objection to the Second Interim Fee Application of Ruta Soulios & Stratis LLP, as Supplemented to Increase Amount of Fees, and Seeking to Convert to a Final Fee Application, and Reservation of Rights to Seek Disgorgement of Fees*, ECF No. 141.

[24]  *Supplement to Chapter 7 Trustee's Motion for Turn-Over of Retainer Balance, and to Petition the Court for an Order Compelling Ruta Soulios & Stratis LLP to Disgorge Fees*, ECF No. 182.

[25]  *Response to Objections to Application of Ruta Soulios & Stratis LLP for a Second Interim Award of Compensation for Services Rendered and Reimbursement of Expenses as Counsel for the Debtors*, ECF No. 124.

[26]  *Response to Objection to Application of Ruta Soulios & Stratis LLP for a Final Award of Compensation for Services Rendered and Reimbursement of Expenses as Chapter 11 Counsel for the Debtors*, ECF No. 143.

[27]  *Ruta Soulios & Stratis LLP's Amended Reply to Chapter 7 Trustee's "Supplement to Chapter 7 Trustee's Motion for Turn-Over of Retainer Balance, and to Petition the Court for an Order Compelling Ruta Soulios & Stratis LLP to Disgorge Fees" and in Further Support of Application of Final Award of Compensation for Services Rendered and Reimbursement of Expenses as Chapter 11 Counsel for the Debtors*, ECF No. 186.

[28]  *Supplemental Memorandum of Law of Ruta Soulios & Stratis LLP in Further Support of Final Fee Application*, ECF No. 194.

Finally, the Chapter 7 Trustee filed a reply to the Response to Motion to Compel (the "Chapter 7

Trustee Reply")[29] and a response to the RSS Memorandum (the "Chapter 7 Trustee Response").[30]

## Applicable Legal Principles

### Retention of Counsel

Section 327(a) of the Bankruptcy Code governs the employment of professionals to

represent the estate during bankruptcy. *In re Worldcom, Inc.*, 311 B.R. 151, 163 (Bankr.

S.D.N.Y. 2004). It authorizes a trustee to retain an attorney subject to court approval and subject

to the requirements that the attorney not have an interest materially adverse to the interests of the

estate and that the attorney be a "disinterested person[]." 11 U.S.C. § 327(a). As relevant, it

provides as follows:

> Except as otherwise provided in this section, the trustee, with the court's approval,
> may employ one or more attorneys . . . that do not hold or represent an interest
> adverse to the estate, and that are disinterested persons, to represent or assist the
> trustee in carrying out the trustee's duties under this title.

*Id.*; *see also In re Project Orange Assocs., LLC*, 431 B.R. 363, 369 (Bankr. S.D.N.Y. 2010)

("Professionals must be both disinterested and not hold or represent any interest adverse to the

estate to be employed under section 327(a)." (citing *Vouzianas v. Ready & Pontisakos (In re*

*Vouzianas)*, 259 F.3d 103, 107 (2d Cir. 2001))). As relevant, the Bankruptcy Code defines a

"disinterested person" as one who "does not have an interest materially adverse to the interest of

the estate or of any class of creditors or equity security holders, by reason of any direct or indirect

relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C.

§ 101(14)(C). Because sections 327(a) and 101(14) of the Bankruptcy Code overlap, the two

prongs of section 327 are satisfied when the professional person is found to be "disinterested" and

---

[29] *Chapter 7 Trustee's Reply to Soulios Amended Response to Supplement Seeking Disgorgement*, ECF No. 187.

[30] *Chapter 7 Trustee's Response to Soulios Supplemental Memorandum of Law*, ECF No. 195.

have no adverse interest. *See In re Martin,* 817 F.2d 175, 179 n.4 (1st Cir. 1987); *see also In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 532 (Bankr. S.D.N.Y. 1994). "These statutory requirements—disinterestedness and no interest adverse to the estate—serve the important policy of ensuring that all professionals appointed pursuant to section 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities." *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994).

The Bankruptcy Code does not address what it means to "hold or represent an interest adverse to the estate," and whether one exists is determined on a case-by-case basis. *See Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 623 (2d Cir. 1999) ("Whether an adverse interest exists is best determined on a case-by-case basis." (citing *In re Caldor*, 193 B.R. 165, 172 (Bankr. S.D.N.Y. 1996))); *see also In re Angelika Films 57th, Inc.*, 227 B.R. 29, 39 (Bankr. S.D.N.Y. 1998) (stating that "the determination of counsel's disinterestedness is a fact-specific inquiry" (citing *TWI Int'l, Inc. v. Vanguard Oil and Serv. Co.*, 162 B.R. 672, 675 (S.D.N.Y. 1994))), *aff'd*, 246 B.R. 176 (S.D.N.Y. 2000). In *Arochem Corp.*, the Second Circuit defined the phrase to mean the following:

> (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

176 F.3d at 623 (quoting *In re Roberts*, 46 B.R. 815, 827 (Bankr. D. Utah 1985), *aff'd in relevant part and rev'd and remanded in part on other grounds*, 75 B.R. 402 (D. Utah 1987)). "More generally, [an interest adverse to the estate] includes any interest or relationship, however slight, 'that would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules.'" *In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998) (quoting *In re Roberts*, 46 B.R. at 828 n.26).

Section 327(a) "is phrased in the present tense, permitting representation by professionals 'that do not *hold* or *represent* an interest adverse to the estate,' and limiting the class of acceptable counsel to those 'that *are* disinterested persons.'" *Yosef A. Mainman and Merhav (M.N.F.) Ltd. v. Spizz (In re Ampal-Am. Israel Corp.)*, 554 B.R. 604, 618 (S.D.N.Y. 2016) (quoting *In re AroChem*, 176 F.3d at 623), *aff'd*, 691 F. App'x 12 (2d Cir. 2017*)* (summary order); *see also In re Black and White Stripes, LLC*, 623 B.R. 34, 50 (Bankr. S.D.N.Y. 2020) ("The test [under section 327(a)] is not retrospective, courts only examine present interests when determining whether a party has an adverse interest."). Moreover, "[t]he determination of adverse interest is objective and is concerned with the appearance of impropriety." *In re Angelika Films 57th, Inc.*, 227 B.R. at 38 (citing *Rome v. Braunstein*, 19 F.3d at 58); *see also In re Granite Partners, L.P.*, 219 B.R. at 33 (noting an "adverse interest" includes "any interest or relationship, however slight, 'that would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules.'" (quoting *In re Roberts*, 46 B.R. at 828 n.26)). Simply put, "if it is plausible that the representation of another interest may cause the debtor's attorneys to act differently than they would without that other representation, then they have a conflict and an interest adverse to the estate." *In re Leslie Fay Cos., Inc.*, 175 B.R. at 533.

Bankruptcy courts and parties "police conflicts" by means of the mandatory disclosure requirements of Rule 2014. *In re Granite Partners*, 219 B.R. at 34. As relevant, that rule provides that the retention application shall state, "to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee or any person employed in the office of the United States trustee." Fed. R. Bankr. P. 2014(a).

13

Courts strictly construe the Rule 2014 disclosure requirements. *See Rome v. Braunstein*, 19 F.3d at 58. That is because "[t]he purpose of Rule 2014(a) is to provide the court and the United States trustee with information to determine whether the professional's employment is in the best interest of the estate." *Exco Res., Inc. v. Milbank, Tweed, Hadley & McCloy LLP (In re Enron Corp.)*, No. 02-cv-5638, 2003 WL 223455 at *4 (S.D.N.Y. Feb. 3, 2003). "The scope of disclosure is much broader [under Rule 2014] than the question of disqualification. . . . The applicant and the professional must disclose all connections and not merely those that rise to the level of conflicts." *In re Granite Partners*, 219 B.R. at 35. Accordingly, "while retention under section 327 is only limited by interests that are 'materially adverse,' under Rule 2014," all connections that are not so remote as to be *de minimis* "must be disclosed." *In re Leslie Fay Cos., Inc.*, 175 B.R. at 536 (quoting 11 U.S.C. § 101(14)(C)).

The professional's duty under Rule 2014 to disclose is self-policing. *Kravit v. Michel (In re Crivello)*, 134 F.3d 831, 839 (7th Cir. 1998). "Absent the spontaneous, timely and complete disclosure required by section 327(a) and Fed. R. Bankr. P. 2014(a), court-appointed counsel proceed *at their own risk*." *Rome v. Braunstein,* 19 F.3d at 59; *see also In re Matco Elecs. Grp., Inc.*, 383 B.R. 848, 853 (Bankr. N.D.N.Y. 2008) ("It is also apparent that the obligation to disclose is not a subjective one, whereby the professional discloses only those 'connections' that he/she/it concludes are relevant."). "Bankruptcy Rule 2014 disclosure is not optional; it's mandatory." *In re Dickson Props., LLC*, No. 11-18617, 2012 WL 2026760, at *8 (E.D. Va. June 5, 2012). Accordingly, "Rule 2014 disclosures are to be strictly construed and failure to disclose relevant connections is an independent basis for the bankruptcy court to disallow fees or to disqualify the professional from the case." *In re Enron Corp.*, 2003 WL 223455 at *4; *see also In re Crivello*, 134 F.3d at 836 ("[C]ounsel who fail to disclose timely and completely their connections proceed

at their own risk because failure to disclose is sufficient grounds to revoke an employment order

and deny compensation."); *In re Leslie Fay Co., Inc.*, 175 B.R. at 533 ("So important is the duty

of disclosure that the failure to disclose relevant connections is an independent basis for the

disallowance of fees or even disqualification.").

Section 329(a) of the Bankruptcy Code provides that,

> Any attorney representing a debtor in a case under this title, or in connection with
> such a case, whether or not such attorney applies for compensation under this title,
> shall file with the court a statement of the compensation paid or agreed to be paid,
> if such payment or agreement was made after one year before the date of the filing
> of the petition, for services rendered or to be rendered in contemplation of or in
> connection with the case by such attorney, and the source of such compensation.

11 U.S.C. § 329(a). "Bankruptcy Rule 2016(b) implements § 329(a) by requiring a debtor's

attorney to file the statement required by that section within 14 days after . . . the order for relief."

*In re Chatkhan*, 496 B.R. 687, 693 (Bankr. E.D.N.Y. 2012).[31] "Both § 329(a) and Bankruptcy

Rule 2016(b) require the source of compensation to be disclosed, 'even if the source is not the

debtor but a third party.'" *In re Nunez*, 598 B.R. 696, 705 (Bankr. E.D.N.Y. 2019) (quoting

3 Collier on Bankruptcy ¶ 329.03 (16th ed. 2019)). This disclosure obligation is mandatory

and not permissive and is central to the integrity of the bankruptcy process. *Charmoy v. McNeilly*

*(In re McNeilly)*, No. 15-30064, 2017 WL 3737536, at *6 (Bankr. D. Conn. Aug. 28, 2017). The

Rule 2016(b) disclosure statement also requires counsel to disclose the source of funds paid for

their services. An attorney must investigate the source of funds received where a reasonable lawyer

---

[31]    Rule 2016(b) states, as follows:

> Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and
> transmit to the United States trustee within 14 days after the order for relief, or at another time as
> the court may direct, the statement required by § 329 of the Code including whether the attorney
> has shared or agreed to share the compensation with any other entity. . . . A supplemental statement
> shall be filed and transmitted to the United States trustee within 14 days after any payment or
> agreement not previously disclosed.

Fed. R. Bankr. P. 2016(b).

would question the client. *In re Parlex Assocs., Inc.*, 435 B.R. 195, 211-14 (Bankr. S.D.N.Y. 2010)

(collecting cases and denying fees because attorney did not satisfy duty to investigate where a

reasonable lawyer would suspect his retainer was paid from proceeds of fraudulent conveyance

and attorney did not investigate); *see also In re Grasso*, 586 B.R. 110, 146 (Bankr. E.D.

Pa. 2018) ("[W]hen an attorney has reason to doubt his client, blind reliance ceases to be

reasonable." (citing *United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997))).

## **Compensation of Retained Counsel**

Section 330 of the Code provides the legal standard for compensating professional persons

employed on behalf of a bankruptcy estate under sections 327 and 1103 of the Bankruptcy Code.

By its plain language, section 330 allows the court to award to professional persons "reasonable"

compensation for necessary services performed. Section 330 states:

> (a) (1) After notice to the parties in interest and the United States Trustee and a
> hearing, and subject to sections 326, 328, and 329, the court may award to a
> trustee, . . . an examiner, . . . or a professional person employed under section
> 327 or 1103—
>
>> (A) reasonable compensation for actual, necessary services rendered
>> by the trustee, examiner, . . . professional person, or attorney and by
>> any paraprofessional person employed by any such person; and
>>
>> (B) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1). In calculating reasonable professional fees, courts typically apply the

"lodestar" method, which involves multiplying the number of hours reasonably spent by the

professional by a reasonable hourly rate. *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542,

551-52 (2010); *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011); *In re Northwest

Airlines Corp.*, 382 B.R. 632, 645 (S.D.N.Y. 2008). Still, "[f]ee applications are to be evaluated in

light of all 'relevant factors' as set forth in section 330(a)(3) of the Bankruptcy Code." *In re Value

City Holdings, Inc.*, 436 B.R. 300, 306 (Bankr. S.D.N.Y. 2010). That section incorporates the

lodestar factors and other specific criteria for the Court to consider in assessing the reasonableness

of the compensation sought. It states:

> (3) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; [and]
>
> . . . .
>
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3); *see also D.A. Elia Constr. Corp. v. Damon and Morey, LLP (In re D.A.*

*Elia Constr. Corp)*, No. 04-CV-975A, 2006 WL 1720361, at *5 (W.D.N.Y. June 19, 2006)

("Section 330 of the Bankruptcy Code incorporates the lodestar analysis by requiring that the

bankruptcy court consider the time spent upon legal services and the rate charged for those

services."), *aff'd sub nom. Bernheim v. Damon & Morey, LLP*, No. 06-3386, 2007 WL 1858292

(2d Cir. June 28, 2007) (summary order). Section 330(a)(3) is clear that the factors enumerated

therein are not exhaustive in determining what constitutes "reasonable" fees. While the Court has

"considerable discretion" in awarding compensation for reasonable and necessary services,

section 330(a)(4)(A) specifically bars compensation for:

> (i) unnecessary duplication of services; or
>
> (ii) services that were not—

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

11 U.S.C. § 330(a)(4)(A).

By definition, the lodestar analysis focuses on the "reasonableness" of a counsel's fees. By application of sections 330(a)(1) and 330(a)(4) of the Bankruptcy Code, in reviewing fee applications, the Court must consider whether the services rendered by counsel were "necessary" and "beneficial" to the administration of the case. *Rubner & Kutner, P.C. v. U.S. Tr. (In re Lederman Enters., Inc.)*, 997 F.2d 1321, 1322-23 (10th Cir. 1993). Whether services are necessary is determined from the perspective of the time at which the services were rendered. 11 U.S.C. § 330(a)(3)(C); *see also In re Kohl*, 421 B.R. 115, 125 (Bankr. S.D.N.Y. 2009); *In re Mesa Air Grp., Inc.*, 449 B.R. 441, 444 (Bankr. S.D.N.Y. 2011). Most courts hold that "a service is 'necessary' if it benefits the estate." *In re Keene Corp.*, 205 B.R. 690, 696 (Bankr. S.D.N.Y. 1997) (quoting *In re Engel*, 190 B.R. 206, 209 (Bankr. D.N.J. 1995)). In this circuit, there is a simple, objective test for evaluating fee applications under section 330(a) of the Bankruptcy Code—"if the services of a debtor's attorney 'are reasonably likely to benefit the debtor's estate, they should be compensable.'" *In re Ames Dept. Stores, Inc.*, 76 F.3d 66, 72 (2d Cir. 1996) (quoting 2 COLLIER ON BANKRUPTCY ¶ 330.04 at 330-43 (15th ed. 1995)). Accordingly, a "bankruptcy court may reduce or disallow a [fee] request if the underlying services conferred no real benefit on the estate." *In re Keene*, 205 B.R at 696.

The fee applicant bears the burden of proving the reasonableness and necessity of the fees sought. *Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of America (In re JLM, Inc.)*, 210 B.R. 19, 24 (2d Cir. BAP 1997); *In re Ridgemour Meyer Props., LLC*, No. 08-13153, 2018 WL 2305765, at *13 (Bankr. S.D.N.Y. May 18, 2018). The Court has an independent duty to review and evaluate

all fee applications. 11 U.S.C. § 330(a)(1); *see In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 841 (3d Cir. 1994); *In re Mesa Air Grp., Inc.*, 449 B.R. at 444 (citing *In re Keene*, 205 B.R. at 695).

**Priority of Payment – Retained Counsel's Fees**

Section 507(a)(2) of the Bankruptcy Code gives second priority treatment to administrative expenses allowed under section 503(b) of the Bankruptcy Code and any fees and charges assessed against the estate under chapter 123 of title 28. 11 U.S.C. § 507(a)(2). As relevant, section 503(b) accords administrative priority status to "compensation and reimbursement awarded under section 330(a) of the [Bankruptcy Code]." 11 U.S.C. § 503(b)(2). Thus, to the extent the Court approves the Fee Application and awards RSS compensation, those fees will be accorded administrative priority status under section 503(b)(2) of the Bankruptcy Code.

Section 726 of the Bankruptcy Code governs the distribution of estate property in chapter 7 cases. 11 U.S.C. § 726. Section 726(a) states the general rule that the first distributions from estate property in chapter 7 cases are to claimants holding allowed priority claims under section 507 of the Code. 11 U.S.C. § 726(a)(1). Section 726(b) puts a finer point on that standard, as it addresses the distribution rules for claims within a particular class of priority creditors. It provides that in cases where a chapter 11 case is converted to a case under chapter 7 pursuant to section 1112(b) of the Bankruptcy Code, allowed administrative priority claims under section 503(b) of the Bankruptcy Code in the chapter 7 cases have priority over allowed claims under section 503(b) that accrue prior to the conversion. 11 U.S.C. § 726(b). By application of section 726(b), where a chapter 11 case is converted to a case under chapter 7 pursuant to section 1112 of the Bankruptcy Code, the administrative expense claims of pre-conversion professionals retained in the chapter 11 case pursuant to section 327 of the Bankruptcy Code that are otherwise entitled to administrative expense status pursuant to sections 330(a) and 503(b) of the Bankruptcy Code are subordinated to

the chapter 7 trustee's administrative expenses. Thus, administrative expense priority claims arising under section 503(b) in a chapter 7 case have priority over any such claims arising prior to the conversion of the case under section 1112 of the Bankruptcy Code. *See* 11 U.S.C. §§ 726(b), 503(b); *see also In re Wingspread Corp.*, 116 B.R. 915, 932 (Bankr. S.D.N.Y. 1990) ("Pursuant to section 726(b), administrative claims under section 503(b) incurred subsequent to conversion have priority over administrative claims incurred before such conversion."); *In re Summit Ventures, Inc.*, 135 B.R. 478, 483 (Bankr. D. Vt. 1991) (noting that "[section] 726(b) affords priority to administrative expenses, the so-called 'burial expenses,' to provide incentive to trustees, professionals, and others to act in a superseding Chapter 7 case."); *In re Lochmiller Indus., Inc*, 178 B.R. 241, 251 (Bankr. S.D. Cal. 1995) ("Section 726(b) provides . . . that a claim allowed under 503(b) after conversion has priority over claims allowed under 503(b) incurred under another chapter.").

## The Parties' Contentions

### Weihai's Contentions

Weihai contends that from the outset of the cases, the Debtors represented that they were parties to certain contracts with Costco and expected to obtain more significant contracts with Costco, which would generate revenues of approximately $20 million and allow the Debtors to operate and eventually confirm a plan of reorganization. Weihai Objection ¶ 3. Weihai says that after it insisted that the Debtors clarify their relationship with Costco, the Debtors disclosed that they were not parties to valuable contracts with Costco, but instead had an arrangement with Capstone, and that Capstone allegedly had the relationship with Costco. *Id.* ¶ 5. Weihai maintains that had the nature of the Debtors' relationship with Costco been clearly and fully disclosed at the outset of the Chapter 11 Cases, the administration of these cases would have been drastically

different and much of the time spent by RSS would not have been required. *Id.* ¶ 7. In short, it contends that had the true nature of the Debtors' relationship with Costco been revealed, the case could have been converted to a Chapter 7 case much earlier. *Id.* ¶ 14. Weihai asserts that further compensation is not merited because the work done in this matter was not "necessary" and because the Debtors pursued a strategy that was calculated to delay Weihai from enforcing its judgment and to ensure that the Debtors' employees continued to receive paychecks. *Id.* ¶ 16.

**The Chapter 7 Trustee's Contentions**

The Chapter 7 Trustee asserts that the Court should disqualify RSS as Debtors' counsel, and in doing so, deny RSS any additional compensation and direct RSS to disgorge the fees that it has been paid to date. The Trustee says that she is entitled to that relief because:

- In the Retention Application, RSS failed to disclose that it represented Sam Kim in the Weihai Litigation, and that Sam Kim is a Director of the Debtors and is the husband of Kuk Ja Kim who owns 100% of the Debtors' membership interests and thus is an "insider" of the Debtors. It is undisputed that RSS did not disclose its relationship with Sam Kim until November 27, 2018, after the Chapter 11 Cases were converted and the Chapter 7 Trustee was appointed. Motion for Disgorgement ¶ 2; Chapter 7 Trustee Reply ¶ 2.

- Although the Level 8 SOFA discloses that the Debtors made payments to Sam Kim and his wife during the 90-Day Period aggregating approximately $234,000, and the Debtors' General Ledger shows transfers by the Debtors to Sam Kim and his wife totaling approximately $350,000, RSS made no effort to claw-back those payments, let alone to investigate them. *See* Motion to Compel ¶ 8, Motion for Disgorgement ¶ 7.

- RSS failed to disclose that On Five, the source of its Retainer, is an insider of Level 8, and that, as clearly set forth in the General Ledger, Level 8 made the On Five Transfers to On Five aggregating $580,000 in March/April 2016, and that those funds were the source of the Retainer. Motion for Disgorgement ¶¶ 3-4. Moreover, the Level 8 SOFA failed to disclose the transfers. Chapter 7 Trustee Reply ¶ 3.

The Chapter 7 Trustee contends that the Retainer is property of the Debtors' estates, and that because the estates are administratively insolvent, the Court should give effect to the subordination provisions in section 726(b)(1). *See* Motion to Compel ¶ 6. She argues that in doing so, the Court

should direct RSS (i) to disgorge the amounts credited against the Retainer under the First Interim

Fee Award, and (ii) to turn over the Retainer Balance, pending a final award of fees at the close of

the Chapter 7 Cases. *See* Motion for Disgorgement at 7.

### RSS's Response to Weihai's Contentions

In short, and among other things, RSS asserts that the nature of Level 8's relationship with

Capstone and Costco was fully and completely disclosed by the Debtors in numerous instances

from the very outset of the case, including in the affidavit of Frank Spadaro dated November 16,

2017 ("Spadaro Affidavit"),[32] which the Debtors filed in support of the Chapter 11 Cases. Initial

Response ¶ 7. RSS maintains that the Spadaro Affidavit is clear (i) that Level 8 was the exclusive

sales representative of Capstone; (ii) that it secured purchase orders from retailers on behalf of

Capstone; and (iii) that its sole source of revenues are and were from commissions paid by

Capstone for business it secured on Capstone's behalf. Initial Response ¶ 8. RSS also contends

that the Court should overrule Weihai's objection because its fees are reasonable and should be

awarded. *See* Initial Response ¶¶ 19-37.

### RSS's Responses to the Chapter 7 Trustee's Contentions

#### On Five Corporation

On Five was formed in March 2016 as an affiliate of Level 8 to engage in the sale of men's

and women's outer garments produced by China-based companies. Motion for Disgorgement ¶ 5.

Frank Spadaro executed Level 8's chapter 11 petition in his capacity as Level 8's president. *See*

Level 8 Petition, Item 17. As of the Petition Date, he also served as On Five's Legal

Representative. Motion for Disgorgement ¶ 3. The Debtors' General Ledger discloses that in

---

[32]    *Affidavit of Frank Spadaro Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York In Support of First-Day Motions and Applications.* The Spadaro Affidavit is annexed as Exhibit 1 to the *Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases*, ECF No. 6.

March/April 2016, Level 8 made the $580,000 in On Five Transfers to On Five for no apparent consideration. *See id.* Although Level 8 recorded the On Five Transfers in the General Ledger, it did not account for them in the Level 8 SOFA. *See id.* ¶¶ 3-5.

As noted, On Five funded RSS's Retainer. RSS made no effort to identify On Five beyond disclosing that it funded the Retainer. It did not look behind On Five to determine the source of the funds used to pay the Retainer. In effect, RSS contends that throughout the course of the Chapter 11 Cases, it was "in the dark" with respect to Level 8's relationship with On Five. RSS asserts that it did not learn about On Five's relationship with Level 8, that a portion of the proceeds from the On Five Transfers was used to pay the Retainer, or that Mr. Spadaro was On Five's registered agent, until March 2019, when the Trustee served a subpoena on Mr. Spadaro. *See* Response to Motion for Disgorgement at 11.

### Sam Kim

Sam Kim is a Director of the Debtor, and the husband of Kuk Ja Kim, who owns 100% of Level 8's membership interests. The Debtors' General Ledger and Level 8's SOFA disclose that Level 8 made payments totaling approximately $350,000 and $234,000, respectively, to Sam Kim and his wife prior to the Petition Date. Motion for Disgorgement ¶ 2; Level 8 SOFA, Item 4.1-4.2.

RSS's relationship with the Debtors and Sam Kim began in 2011 when Level 8, WCC, and Sam Kim retained RSS to represent them in the Weihai Litigation in district court. Joseph Ruta, Esq. was RSS's lead counsel on that matter. Response to Motion for Disgorgement at 5. After the trial in the action, on August 31, 2016, Magistrate Judge Frank Maas issued a bench ruling (the "Weihai Decision")[33] in which, among other things, he granted judgment against each of Level 8

---

[33]    A copy of the transcript of the Weihai Decision is annexed as Exhibit 1 to the Response to Motion for Disgorgement.

and WCC in the sum of $1,345,764.68 for goods sold and delivered. *See* Weihai Decision at 16:9-11. Sam Kim, in his capacity as an officer of Level 8, signed the contracts underlying the dispute in that action, although he did not provide a payment guaranty to Weihai. *Id.* at 7:6-12, 12:9-12. Weihai sued Sam Kim on a veil-piercing theory, to hold him liable for any amounts that Level 8 was obligated to pay Weihai. *Id.* at 16:25-17:1. Judge Maas dismissed the claims against Sam Kim. *Id.* at 17:18-18:15.[34] On September 28, 2016, Judge Maas entered his Order and Judgment in the Weihai Litigation. In part, it states that "Weihai's claims against Defendant Scott Kim, a/k/a Sam Kim, a/k/a Seung Bong Kim, are denied in their entirety and dismissed." Weihai Order and Judgment at 2.[35]

The Debtors support their decision to retain RSS by asserting that "[b]y and through the Weihai Litigation, which went to trial in 2015, [RSS] became uniquely familiar with the Debtors' capital structure; the operation of the Debtors' businesses; the Debtors' relationship with its primary lender; the Debtors' financial affairs and condition, and many of the potential legal issues

---

[34]    In so ruling, Judge Maas found that "[a]t the summary judgment stage, Weihai paid scant attention to this claim. The record, frankly, has not much improved following the trial of this case." Weihai Decision at 17:2-4. In dismissing the veil piercing claim, Judge Maas reasoned as follows:

> There is evidence that Sam Kim took out a personal loan to provide $100,000 to one of his corporations, which in turn made a payment to Weihai. There is no evidence, however, that this was not documented as a loan on the books of the corporation receiving the funds or, more importantly, that Kim was treating corporate assets as his own; for example, by using one or both of the corporate defendants' funds to meet his own personal obligations.

> Accordingly, while the line between WCC and Level 8 may at time have been blurred, Weihai has not introduced evidence sufficient to show that the corporate forms of WCC and Level 8 should be disregarded, and that Sam Kim should be held individually liable for their debts.

> So, based on the limited evidence presented at trial regarding this issue, I decline to hold Sam Kim individually liable.

Weihai Decision at 17:25-18:15.

[35]    Order and Judgment, *Weihai Textile Grp. Import & Export Co., Ltd. v. Level 8 Apparel LLC*, No. 11-cv-4405 (S.D.N.Y. Sept. 26, 2016), ECF No. 214.

that might arise in the context of these cases." Retention Application ¶ 4. In support of the
Retention Application, the Debtors represent that:

> To the best of the Debtors' knowledge the members, counsel, and associates of
> [RSS] (a) do not have any connection with any of the Debtors, their affiliates,
> their creditors, or any other party in interest, or their respective attorneys and
> accountants . . . (b) are "disinterested persons," as that term is defined in
> section 101(14) of the Bankruptcy Code, as modified by Bankruptcy Code
> section 1107(b); and (c) do not hold or represent any interest adverse to the estates.

*Id.* ¶ 9. In making that representation, the Debtors did not disclose that RSS represented Sam Kim

in the Weihai Litigation, or the nature and extent of Sam Kim's relationship with the Debtors. In

the Retention Application, the Debtors disclose that they "caused [RSS] to be paid $70,000, which,

as stated in the Engagement Letter, constituted a 'classic retainer.'" Retention Application ¶ 16.

They also disclose that "[t]he aforesaid retainer was paid to [RSS] by On Five Corporation, which

has licensed to the Debtor[s] the right to produce and distribute apparel goods under its name and

brand." *Id.* The Level 8 SOFA discloses that on November 10, 2016, Level 8 paid $70,000 to RSS

and that the source of the payment was "On Five Corp." *See* Level 8 SOFA, Item 11.1. The Debtors

do not disclose that On Five Corporation is an insider of the Debtor,[36] and that On Five made the

payment out of the $580,000.00 that the Debtors transferred to On Five in March/April 2016.

Mr. Soulios submitted his Rule 2014 Declaration (the "Soulios Rule 2014 Declaration")[37]

in support of the Retention Application. In it, Mr. Soulios does not disclose that RSS represented

the Debtors and Sam Kim in the Weihai Litigation. He discloses that "due in part to its

representation of the Debtors in a pre-petition litigation . . . [RSS] has become familiar with the

---

[36] According to NYS Corporation records, Level 8's Acting President, Frank Spadaro, who signed Level 8's
Petition, is the Legal Representative of On Five Corporation. Motion for Disgorgement ¶ 3.

[37] *Declaration [of Steven A. Soulios] in Support of Debtors' Application for an Order Pursuant to 11 U.S.C. §§
327(a) and 329, Fed. R. Bankr. P. 2014 and 2016, and S.D.N.Y. LBR 2014-1 and 2016-1 Authorizing Employment
and Retention of Ruta Soulios & Stratis LLP as Bankruptcy Counsel Nunc Pro Tunc to the Petition Date.* The Soulios
Rule 2014 Declaration is annexed as Exhibit B to the Retention Application.

Debtors' businesses and many of the potential legal issues that may arise in the context of these chapter 11 cases." Soulios Rule 2014 Declaration ¶ 2. Mr. Soulios also discloses that "[p]er the terms of its Engagement Letter with the Debtors, on November 7, 2016, [RSS] was paid $70,000, which as stated in the Engagement Letter, constituted a 'classic retainer.'" *Id.* ¶ 9. He does not disclose that On Five is the source of the $70,000 payment. RSS discloses that fact in the Form 2030 Disclosure,[38] in which it says that it has been paid $70,000, identifies On Five as the "source of compensation paid to [RSS]," Form 2030 Disclosure ¶ 2, and identifies the Debtors as the "source of compensation to be paid to [RSS]," *id.* ¶ 3. Mr. Soulios does not disclose that On Five is an affiliate of the Debtors, that the Debtors made the On Five Transfers to On Five, or that On Five used $70,000 of the proceeds of the transfers to pay the Retainer.

As to its failure to disclose its relationship with Sam Kim, RSS maintains that "[its] omission of its prior representation of Mr. Kim in the Weihai Litigation was an innocent oversight and inadvertent." Response to Motion for Disgorgement at 5. It says that the

> primary reason for [the oversight] was due to the fact that (i) Mr. Soulios' partner, Joseph Ruta, virtually exclusively handled the Weihei [sic] litigation from 2011 through a jury trial in 2015, a mistrial, and post-trial proceedings, (ii) that the Weihei [sic] matter was primarily a commercial dispute involving Weihei [sic] and Level 8, [and] (iii) claims against Mr. Kim in the Weihei [sic] litigation were deemed baseless and were ultimately dismissed by the court.

*Id.*; *see also* RSS Memorandum at 3 ("[Mr. Soulios] erroneously did not disclose that RSS had previously represented Sam Kim, because (i) the suit against Sam Kim was brought merely because of his status as an officer of the Debtor[s] and had been dismissed, and (ii) Mr. Soulios had little involvement with the Weihai matter."). Moreover, RSS maintains that it did not intend to conceal the fact of its representation of Sam Kim from anyone and that, in any event, any

---

[38] *Disclosure of Compensation of Attorney for Debtor*, ECF No. 23 (the "Form 2030 Disclosure").

interested party could have easily learned, on its own, of the fact of its representation of Sam Kim. As support, it notes that (i) "[it] did indicate in its retention papers that it represented the Debtor[s] in [their] pre-petition litigation with Weihei [sic], which would have enabled any interested party to ascertain that it also represented Mr. Kim in that closed case," Response to Motion for Disgorgement at 5; (ii) in paragraph 13 of the Rule 1007 Affidavit he submitted in the World Cross Culture, Inc. case,[39] Sam Kim disclosed that he was named as a defendant in the Weihai Litigation, *id.*; and (iii) "[i]f RSS intended to be misleading about its representation of Mr. Kim in the Weihei [sic] [Litigation] it would not have disclosed (i) the caption of the case and case number and (ii) that Mr. Kim was a co-defendant." *Id.* at 5.

RSS also disputes the Chapter 7 Trustee's contention that the Court should penalize RSS because it did not pursue avoidance claims against Sam Kim and his wife. RSS maintains that its decision not to pursue potential causes of action was based upon the uncertainty of success in such litigation, the expense associated with such litigation, and the fact that the Debtors were negotiating exit financing alternatives with the Kims. As to the former, RSS contends that the principals have potential defenses to liability and that pursuing the litigation would be costly. *See* Response to Motion to Compel ¶ 10. Regarding the exit financing, RSS asserts that in negotiations, the principals indicated that they were willing to provide a $200,000 "New Value Loan" to fund a plan. *Id.*; Initial Response ¶ 31. As support, it submits an undated, unsigned, and incomplete Term Sheet. Initial Response, Ex. 8 at 1. RSS asserts that, prior to the conversion of the Chapter 11 Cases, neither the UST, Weihai, nor any other creditor advised RSS that the Debtors unjustifiably failed to initiate avoidance actions against the Kims. RSS argues that Level 8's creditors could

---

[39] *Affidavit of Scott Kim Pursuant To Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications*, Case No. 16-13166, ECF No. 4 ¶ 13.

have sought leave of this Court to pursue litigation against the Kims prior to the conversion of the cases. *See* Response to Motion for Disgorgement at 10-11. It contends that "the failure of any creditor to seek leave to initiate an adversary proceeding is further probative evidence that pursuing the Kims on behalf of the estate[s] was not deemed a worthwhile endeavor or wise expenditure of estate[s'] assets." *Id.* at 11.

Finally, RSS contends that its relationship with Sam Kim did not give rise to a conflict of interest. It is undisputed that its representation of Sam Kim ended prior to the Petition Date. As such, RSS asserts that it owed no duty to Sam Kim at any time during the pendency of the Chapter 11 Cases and had no incentive to put his interests ahead of those of the estates. RSS Memorandum at 7. It maintains that the Chapter 7 Trustee has failed to demonstrate that RSS held an interest adverse to the Debtors' estates or their creditors and that she failed to proffer any evidence of RSS's failure to disclose negatively impacting the Chapter 11 Cases or warranting disqualification of counsel under the New York Professional Conduct Rules. *See* Response to Motion for Disgorgement at 6.[40]

---

[40]    Rule 1.9 of the New York Rules of Professional Conduct provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

RSS asserts that it was not in violation of this section, as the pre-petition breach of contract claims asserted by Weihai were not "substantially related" to the chapter 11 reorganization. Response to Motion for Disgorgement at 6.

### Turnover of the Retainer

In short, RSS asserts that since the Retainer is a "classic" retainer, it is not property of the estates and could never be subject to disgorgement. *See* Response to Motion to Compel ¶¶ 1, 4; *see also* Response to Motion for Disgorgement at 4 ("RSS maintains that, as a matter of law, the [Retainer Balance] is not property of the Debtor[s'] estate[s] . . . .").

### Discussion

### RSS's Relationship With Sam Kim

In seeking to disqualify RSS, deny the Fee Application, and compel RSS to disgorge the fees that it has been paid to date, the Chapter 7 Trustee relies principally on *In re Kendavis Indus. Int'l, Inc.*, 91 B.R 742 (Bankr. N.D. Tex. 1988); *In re R&R Assocs. of Hampton*, No. 91-10983, 2003 WL 1233047 (Bankr. D.N.H. 2003), *vacated on other ground and remanded sub nom. Bezanson v. Thomas*, No. CIV 03-127, 2003 WL 21434911 (D.N.H. June 20, 2003); and *Tenzer Greenblatt LLP v. Silverman (In re Angelika Films 57th, Inc.)*, 246 B.R. 176 (S.D.N.Y. 2000). In each of those cases, the bankruptcy court denied the fee application of retained counsel and/or directed the disgorgement of fees paid to counsel, on the grounds that counsel was not disinterested under section 327(a) of the Bankruptcy Code. In each case, the court arrived at its conclusions based on information discovered during the pendency of the bankruptcy case regarding retained counsel's relationship with insiders of the debtors, and based on the fact that during the case, counsel took actions benefitting the debtors' insiders to the detriment of the debtor or throughout

the case were acting for the benefit of the insiders.[41] Those cases are relevant but, in part, are distinguishable.

The Court finds that RSS's representation of Sam Kim in the Weihai Litigation did not pose an "actual conflict" for RSS when it was retained as Debtors' bankruptcy counsel. As noted,

---

[41]    In *In re Kendavis Indus. Int'l, Inc.*, the law firm of Locke Purnell was retained as debtors' counsel in their chapter 11 cases. The matter before the court was a joint motion filed by a group of creditors seeking the disgorgement of fees paid to Locke Purnell on the grounds that Locke Purnell had disqualifying conflicts of interest and failed to disclose compensation paid in connection with its retention, and because the services Locke Purnell rendered did not benefit the debtors' estates. *Id.* at 744. The court found that, notwithstanding that Locke Purnell had been retained to serve as bankruptcy counsel for the debtors, throughout its tenure as debtors' counsel, its "primary client" was the Davis family. The court also found that Lock Purnell acted for, and principally represented the interest of the Davis family and the debtors' principals. It determined that Locke Purnell was not disinterested and had a conflict of interest throughout the course of its representation of the debtors:

> The activities of Locke Purnell best served the principals of KHC, primarily the Davis family. Locke Purnell's actions in this case were designed to further the interests of their primary client, the Davis family. Therefore, serious conflict of interest problems arise, and questions as to the benefit of Locke Purnell's service to the estate are apparent. It is plain to this Court from the Findings of Fact, that Locke Purnell was not disinterested during its term as counsel for the Debtors.

*See id.* at 752. The court ordered Locke Purnell to disgorge 50% of the compensation that it been paid in the case.

In *In re R&R Assocs. of Hampton*, the debtor ("R&R Associates") was a general partnership consisting of two partners, Reginald L. Gaudette and Richard V. Choate. 2003 WL 1233047, at *1. R&R Associates filed a chapter 11 petition and, thereafter, retained counsel (the "Law Firm") to represent it in the chapter 11 case. When it was retained, the Law Firm was representing, and thereafter continued to represent, Gaudette and his wife in the formation of three family limited partnerships, and the transfer of personal assets, including real estate, cash, notes, and securities into these limited partnerships. *Id.* at *4. Thus, as of the commencement of the case, the Law Firm simultaneously represented the debtor, Gaudette (a general partner of the debtor), his wife, and three family limited partnerships in which the Gaudettes were either general or limited partners. In its retention application, the Law Firm failed to disclose that representation. *Id.* at *6. The chapter 11 case failed and was converted to a case under chapter 7 of the Bankruptcy Code. The chapter 7 trustee sued the Law Firm for damages allegedly caused by, among other things, its failure to disclose its relationship to the Gaudettes in its retention application. In resolving the matter, the court found that the Law Firm failed to meet the disclosure requirements in section 327(a) and Rule 2014(a). *Id.* Further, it found that the Law Firm's representation of both the debtor and Richard Gaudette was a conflict of interest. *Id.* The court held that "[t]he representation of the [d]ebtor partnership and its general partner is, by itself, almost always a conflict of interest, and the representation of a material adverse interest . . . . This, coupled with the representations of the limited partnerships, which limited partnerships' interest held by Reginald Gaudette became his major asset, just adds to the conflict." *Id.* at *4. As a sanction for both its failure to disclose its relationship with the Gaudettes and for the firm's disqualifying conflict of interest, the court directed the Law Firm to disgorge the fees that it had been paid. *Id.* at *6.

In *In re Angelika Films 57th, Inc.*, 227 B.R. 29 (Bankr. S.D.N.Y. 1998), the matter before the bankruptcy court was whether debtor's counsel, Tenzer Greenblatt ("Tenzer") was entitled to compensation under section 330 of the Bankruptcy Code. At a hearing on its final application for allowance of compensation and reimbursement of expenses, the court questioned the disinterestedness of Tenzer based upon certain actions it took in filing a motion (the "Motion to Assign") on behalf of the debtor to assume and assign its lease to the debtor's principal ("Mr. Saleh") at a price that was substantially below the price that counsel had, a few days earlier, claimed was the market value of the lease. *Id.* at 32. In considering that matter, and in assessing various actions taken by Tenzer in its representation of the debtor, the Court found that from the inception of its retention as debtor's counsel, Tenzer had a predisposition to take actions to protect the interests of Mr. Saleh, even if those actions were contrary to the debtor's interests. *Id.* at 40. Accordingly,

section 327(a) "is phrased in the present tense, permitting representation by professionals 'that do not *hold* or *represent* an interest adverse to the estate,' and limiting the class of acceptable counsel to those 'that *are* disinterested persons.'" *In re Ampal-Am. Israel Corp.*, 554 B.R. at 618 (quoting *AroChem*, 176 F.3d at 623). As a result, "counsel will be disqualified under section 327(a) only if it presently holds or represents an interest adverse to the estate, notwithstanding any interests it may have held or represented in the past." *Id.* RSS's representation of Sam Kim terminated before the Petition Date, and the "veil piercing" claims asserted by Weihai against Sam Kim in the Weihai Litigation do not substantially relate to the claims asserted by or against Sam Kim in these bankruptcy cases. Moreover, the Chapter 7 Trustee does not complain that RSS worked for the benefit of Sam Kim and other insiders during its tenure as bankruptcy counsel. Rather, her complaint is that RSS did not disclose its relationships with Level 8's insiders and, in essence, during the case, turned a blind eye to the Debtors' relationship with their insiders. The Chapter 7 Trustee complains that RSS failed to do any analysis of the transactions between the Debtors and their insiders. Indeed, based on the RSS time records, it is clear that RSS did not conduct a preference or fraudulent transfer analysis with respect to Sam Kim, his wife, On Five, or any other

---

the court found that Tenzer's representation of the debtor and Mr. Saleh constituted an actual conflict of interest from the inception of the case. *Id.*

In reaching that conclusion, in light of testimony and documents submitted at the court's hearing on the matter, the court found that, taken together, the following actions by Tenzer demonstrated that it never intended to fulfill its obligations to the debtor: (i) the arrangement whereby Mr. Saleh funded Tenzer's retainer agreement; (ii) Mr. Saleh guaranteed payment of Tenzer's fees; (iii) the debtor's management contract with Amelia Management, a company controlled by Mr. Saleh; and (iv) the filing of the Motion to Assign. *Id.* at 40-41. The court found that "[t]he defining act evidencing Tenzer's intentions was the filing of the Motion to Assign, which was nothing more than a scheme devised by Tenzer to keep Mr. Saleh in control of the [d]ebtor so that he could control the [d]ebtor's most valuable asset, the leasehold interest." *Id.* at 41. As a sanction for Tenzer's "egregious conduct," the court disallowed all the fees and expenses sought by Tenzer, including those amounts sought for services performed that were reasonably likely to benefit the estate. *Id.* at 44. It also directed Tenzer to disgorge the $22,000 paid to it under the retainer agreement. *Id.* at 45. The district court affirmed on appeal. *See In re Angelika Films 57th, Inc.*, 246 B.R. 176 (S.D.N.Y. 2000).

insider of the Debtors, let alone make any effort to identify the transfers between the Debtors and third parties.

Although RSS's prior representation of Sam Kim does not rise to the level of an actual conflict of interest, it is plain that in failing to disclose in the Soulios Rule 2014 Declaration its relationship with On Five and that it represented Sam Kim in the Weihai Litigation, RSS did not provide adequate disclosure of all connections with the Debtors and "parties in interest," as required by Bankruptcy Rule 2014. *See* Fed. R. Bankr. P. 2014(a). As noted, RSS did not investigate the source of the Retainer and says that its failure to disclose its relationship with Sam Kim was an "oversight." RSS submits that it was justified in not pursuing claims against Sam Kim because it determined that Sam Kim and his wife have potential defenses to liability, pursuing claims against them would be costly, and Mr. Kim was a potential source of financing for the Debtors. *See* Response to Motion for Disgorgement at 5; Response to Motion to Compel ¶ 10. As support for the latter, RSS points only to an undated, unsigned and incomplete Term Sheet that provides for Sam Kim to make a $200,000 "new value" subordinated loan (not a capital contribution) to fund a chapter 11 plan. *See* Initial Response, Ex. 8 at 1. RSS's time records show that RSS first spoke to Mr. Spadaro about the terms of the draft term sheet on September 21, 2017, and that the first draft of the term sheet was finalized on September 27, 2017.[42] The time records do not disclose any communications with Sam Kim regarding the terms of plan financing. Moreover, RSS provides no support to substantiate its conclusions regarding the risks associated with litigating with Sam Kim, and RSS's time records do not evidence that RSS did any analysis of potential claims against Sam Kim, or any other insider, or the costs and risks associated with litigating such claims. Finally, given the prominent role that Sam Kim had with the Debtors—

---

[42] The corresponding time entries for September 21, 2017, are in the Second Interim Fee Application, Ex. A at 3.

including executing the WCC chapter 11 petition and the Engagement Letter—in his capacity as WCC's president, the Court cannot reconcile RSS's "oversight" in not disclosing its pre-petition relationship with Sam Kim. RSS's failure to disclose its relationship with Sam Kim runs afoul of its disclosure obligations under Rule 2014.

The Court also finds no merit to RSS's assertion that there was enough information in documents filed in the Chapter 11 Cases that interested parties could have discovered that Sam Kim was a defendant in the Weihai Litigation, and that RSS represented him in that litigation. RSS's duty to disclose its connections with parties in interest is "self-policing." *In re Crivello*, 134 F.3d at 839. Neither the Court nor parties in interest should have to "rummage through files or conduct independent factfinding investigations" to determine if the professional is disqualified. *In re Rusty Jones, Inc.*, 134 B.R. 321, 345 (Bankr. N.D. Ill. 1991); *see also In re Leslie Fay Co., Inc.*, 175 B.R. at 533 ("Rule 2014 disclosure requirements are to be strictly construed. . . . All facts that may have any bearing on the disinterestedness of a professional must be disclosed. Consistent with the duty placed on the professional, it is the responsibility of the professional, not of the court, to make sure that all relevant connections have been brought to light.").

Further, RSS's failure to comply with the disclosure mandates of Rule 2014 has caused harm to the Debtors' estates. If RSS had disclosed its relationship with Sam Kim and Sam Kim's relationship with Level 8, interested parties such as the UST could have vetted the issues of RSS's potential conflicts of interests, including whether RSS's relationship with Sam Kim and his wife disqualified RSS from leading an investigation into the estates' potential claims against them and other insiders of the Debtors. As it is, neither the UST, nor any other interested party, had reason to question the nature of the relationship because RSS failed to disclose it. For this reason, the Court finds no merit in RSS's assertion that the failure of third parties to seek leave to bring claims

against the Kims is evidence that pursuing them was not a worthwhile endeavor or wise expenditure of the estates' assets. *See* Response to Motion for Disgorgement at 11. Instead, that work has been left to the Chapter 7 Trustee, who, after investigating the estates' potential claims, is suing Sam Kim and his wife to recover alleged fraudulent transfers,[43] preferential transfers and unauthorized post-petition transfers,[44] and to recover damages for alleged fraud, conversion, breach of fiduciary duty,[45] misrepresentation[46] and unjust enrichment,[47] as well as aiding and abetting the primary misconduct committed by other defendants.[48]

RSS failed to make adequate disclosure of its connections with Sam Kim and his wife under Rule 2014. In appropriate cases, that is grounds to disqualify retained counsel and/or disallow its fees. *See In re Crivello*, 134 F.3d at 836 ("Counsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation."); *In re Leslie Fay Co., Inc.*, 175 B.R. at 533 ("So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees or even disqualification.").

### RSS's Relationship With On Five

The Court also finds that RSS breached its disclosure obligations under section 329 and Rules 2014 and 2016 by failing to disclose that On Five, the source of the Retainer, is an insider of Level 8 and that On Five paid the Retainer out of the funds transferred to On Five pursuant to

---

[43] *See Complaint*, AP No. 19-01335, ECF No. 1 ¶¶ 99-121, 127-137, 157-164.

[44] *See id.* ¶¶ 122-126, 138-142.

[45] *See id.* ¶¶ 143-146, 155-164.

[46] *See id.* ¶¶ 190-198.

[47] *See id.* ¶¶ 165-171.

[48] *See id.* ¶ 213.

the On Five Transfers. As noted, when it was retained by the Debtors, RSS made no effort to

ascertain On Five's relationship with the Debtors or the source of the funds that On Five used to

pay the Retainer. RSS says that it was qualified to serve as Debtors' counsel in the Chapter 11

Cases because, through its representation of the Debtors and Sam Kim in the Weihai Litigation, it

became familiar with the Debtors' capital structure, the operation of the Debtors' businesses, and

the Debtors' financial affairs. Particularly in that light, RSS was obligated to ascertain and disclose

On Five's relationship with the Debtors and the source of the funds for the Retainer. Had it done

so, the UST and other interested parties could have considered the impact that On Five's

relationship with the Debtors and Sam Kim had on RSS's retention, as well as any potential

conflicts arising out of that relationship. That is significant, because RSS did not analyze the On

Five Transfers, and the Chapter 7 Trustee has sued On Five to recover the On Five Transfers as

fraudulent transfers.[49]

### The Trustee's Turnover Demand

The Chapter 7 Trustee contends that the Retainer is property of the Debtors' estates. She

asserts that because the estates are administratively insolvent, the Court should give effect to the

subordination provisions in section 726(b)(1). *See* Motion to Compel ¶ 6. She also contends that

the Retainer is property of the Debtors' estates, and that the Court should direct RSS (i) to disgorge

the amounts credited against the Retainer under the First Interim Fee Award, and (ii) to turn over

the Retainer Balance, subject to a final award of fees at the close of the Chapter 7 Cases. *See*

Motion for Disgorgement at 7. RSS disputes those contentions.

In part, the Engagement Letter states the following:

Retainer. The Company will provide to the Firm, a "classic retainer" in the amount
of US $70,000.00 as defined in In re King, 392 B.R. 62 (Bankr. S.D.N.Y. 2008)

---

[49]   *See Complaint*, AP No. 19-01335, ECF No. 1 ¶¶ 99-110, 157-164.

and S.E.C. v. Towers Financial Corp., 1993 WL 276935 (S.D.N.Y. 1993) and In re McDonald Bros. Construction [sic], Inc., 114 B.R. 989, 997 99 [sic] (Bankr. N.D.Ill. [sic] 1990). As such, the classic retainer was earned by the Firm upon receipt. The initial amount of the classic retainer was set to approximate our estimate of fees and expenses expected to be accrued and unpaid by the Company between payment cycles. The Firm's estimate of expected fees and expenses may change based upon actual or expected fees and expenses incurred or expected to be incurred, as applicable. Further, the Company agrees to replenish the classic retainer upon receiving invoices from the Firm so that the classic retainer amount remains at or above the Firm's estimated fees and expenses expected to be accrued and unpaid by the Company between payment cycles.

Engagement Letter at 2. RSS asserts that since the Retainer is a "classic" retainer, it is not property of the estates and could never be subject to disgorgement. Response to Motion to Compel ¶¶ 1, 4; *see also* Response to Motion for Disgorgement at 4 ("RSS maintains that, as a matter of law, the [Retainer Balance] is not property of the Debtor[s'] estate[s] . . . ."). The Court considers those matters below.

Section 541(a)(1) of the Bankruptcy Code provides that property of the estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). State law determines whether a debtor has an interest in property. *See Buchwald v. Renco Grp., Inc. (In re Magnesium Corp. of Am.)*, 399 B.R. 722, 758 (Bankr. S.D.N.Y. 2009). "A prepetition retainer becomes property of the estate only when, under applicable state law, the debtor has an interest in the retainer at the time of filing." *SEC v. Towers Fin. Corp.*, No. 93-cv-0744, 1993 WL 276935, at *4 (S.D.N.Y. July 21, 1993); *see also In re D.L.I.C., Inc.*, 120 B.R. 348, 350 (Bankr. S.D.N.Y. 1990) ("The court must look to state law to determine the extent to the extent of a debtor's interest in a retainer in order to resolve the issue as to whether or not the retainer is property of the estate under 11 U.S.C. § 541."). In general, New York recognizes three different categories of retainers regarding lawyer-client relations: (i) the classic, or general, retainer agreement; (ii) the security retainer agreement; and (iii) the advanced

payment retainer agreement. *See Ruberto v. DeFlippo*, 913 N.Y.S.2d 889, 891 (N.Y. Civ. Ct. 2010); *In re King*, 392 B.R. 62, 70 (Bankr. S.D.N.Y. 2008).

A classic or general retainer secures an attorney's availability over a certain period of time; it is not paid as compensation for specific services. *See Ruberto*, 913 N.Y.S.2d at 891; *see also Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d 420, 446 (S.D.N.Y. 1998) (finding classic retainer where the attorney was "being paid first and foremost for his availability and not merely for specified services" and that "the attorney commits himself to being available to client over an extended period of time, without knowing in advance the nature and extent of projects on which he will be obliged to work"). Thus, an attorney is entitled to retain a classic retainer irrespective of whether it performs services to the client. *Entegra Power Grp. LLC v. Dewey & Leboeuf LLP (In re Dewey & Leboeuf LLP)*, 493 B.R. 421, 428 (Bankr. S.D.N.Y. 2013) (noting that under a classic retainer, "the attorney is entitled to the Retainer regardless of whether any services are performed for the client"); *Plattsburgh Hous. Auth. v. Cantwell*, No. 2013-0858, 2017 WL 593160, at *31 (N.Y. Sup. Ct. 2017) ("Because the general retainer fee is given in exchange for availability, it is a charge separate from fees incurred for services actually rendered." (quoting *Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys.*, 20 F. Supp. 2d 645, 653 (S.D.N.Y. 1998))). Generally, courts find that such classic retainers do not become property of the estate. *See, e.g.*, *In re King*, 392 B.R. at 70; *see also Barron v. Countryman*, 432 F.3d 590, 595 (5th Cir. 2005).

A security retainer "is a retainer agreement in which the attorney holds the money solely to secure the ability of the client to pay for the services the client expects the lawyer to render in the future." *Ruberto*, 913 N.Y.S.2d at 891. "The money remains the property of the client until the attorney applies it to charges incurred for services actually rendered," and "all 'unearned' fees are required to be returned to the client." *Id.*; *see also Barron*, 432 F.3d at 595-96 ("A security retainer

involves fees paid to counsel for prospective services. The debtor retains an interest in the funds

until services are actually rendered. Pending the rendition of services, the attorney merely 'holds'

the funds for the debtor." (citations omitted)). A security retainer is property of the debtor's estate.

*In re King*, 392 B.R. at 70; *see also Barron v. Countryman*, 432 F.3d at 596 ("Because the debtor

retains an interest in these funds, they become property of the estate at filing subject to §§ 329

and 330.").

An advance payment retainer "involves fees paid to an attorney for services to be rendered

[where] the payment passes to counsel upon remittance at which time the debtor relinquishes all

interest in the monies unless there is an express agreement for the payment to be held in trust or

escrow." *In re King*, 392 B.R. at 70-71.

> [A]n "advance payment" retainer[] involves a payment by debtor, in advance, for
> some or all of the services that the attorney is expected to perform. "Ownership of
> the retainer is intended to pass to the attorney at the time of payment, in exchange
> for the commitment to provide the legal services." *In re McDonald*, 114 B.R. at
> 1000. Absent any express agreement that the payment be held in trust or escrow,
> ownership passes upon payment of the advance.

*Towers Fin. Corp.*, 1993 WL 276935, at *4.

However, when an advance payment retainer is intended to be a general prepayment for

future services, rather than a flat fee, it should be properly regarded as a general security retainer,

and any amounts earned should be fully refundable to clients:

> [A]n advance payment retainer that is earned upon receipt can be only one of two
> things: a flat fee or a security retainer that is earned upon receipt. An advance
> payment retainer that is really a security retainer earned upon receipt might be
> deposited in a lawyer's general account rather than a trust account, but it must be
> refundable to the client if the lawyer does not perform the services to which the
> retainer relates.

Douglas R. Richmond, *Understanding Retainers and Flat Fees*, 34 J. Legal Prof. 113, 120 (2009)

(footnote omitted).

In *Ethics Opinion 816*,[50] the New York State Bar Association has clarified that lawyers in New York may ethically accept advance payment retainers, and that any such sums become property of the attorney upon receipt. *Ethics Opinion 816* specifically notes:

> Although the advance payment retainer is not client property, the client retains an interest in that portion of the retainer that is not yet earned by the lawyer. Furthermore, at the conclusion of the representation the lawyer must promptly return any portion of the advance payment retainer that is not earned. Finally, it would be inappropriate for a lawyer to negotiate a nonrefundable advance payment retainer with the client.

As the New York State Bar Association notes, unless a retainer is earned, such retainer must be capable of refund to the client. This accords with general New York law, which prohibits non-refundable security retainers on the grounds that it could force clients to pay for services that they did not want, and therefore impair a client's right to terminate representation. *See In re Cooperman*, 633 N.E.2d 1069, 1072 (N.Y. 1994) (approving a two-year suspension for an attorney that utilized "special nonrefundable retainer fee agreements" and refused to refund such retainers irrespective of whether any professional services were actually rendered). In *Ruberto*, the court examined a supposed advance fee retainer and held that

> [t]he mere fact that the client advances money through a retainer payment[] does not entitle the attorney to claim 'ownership' of the funds at the moment of receipt. It is in effect money of the client to be held in a constructive trust with the attorney being entitled to payment as he performs work. If the attorney does not perform the work he must return the money.

*Ruberto*, 913 N.Y.S.2d at 892.

Here, there is at least some evidence that the Retainer is a classic retainer. The Engagement Letter provides that the Debtors "will provide to [RSS] a 'classic retainer' in the amount of US $70,000.00 as defined in In re King, 392 B.R. 62 (Bankr. S.D.N.Y. 2008) and S.E.C. v. Towers

---

[50]    Committee on Professional Ethics, *Ethics Opinion 816*, NEW YORK STATE BAR ASSOCIATION, ¶ 8 (Oct. 26, 2007), https://nysba.org/ethics-opinion-816/.

Financial Corp., 1993 WL 276935 (S.D.N.Y. 1993) and In re McDonald Bros. Construction [sic],

Inc. 114 B.R. 989, 997 99 (Bankr. N.D.Ill. [sic] 1990). As such, the classic retainer was earned by

[RSS] upon receipt." Engagement Letter at 2. Furthermore, the Engagement Letter provides that

"[t]he classic retainer will be placed into [RSS's] general cash account, will not be held in a

separate account on your behalf, and you will not receive any interest on these monies. You have

no interest in the classic retainer. This amount does not constitute a security deposit." *Id.* The

Retention Application states that on November 7, 2016, the Debtors caused RSS to be paid

$70,000, "which, as stated in the Engagement Letter, constituted a 'classic retainer.'" Retention

Application ¶ 16. Additionally, the Retention Order states that "[t]he Debtors are authorized to

retain and employ [RSS] as their attorneys *nunc pro tunc* to the Petition Date in accordance with

the terms and conditions set forth in the Application and in the Engagement Letter attached hereto

as Exhibit 1." Retention Order ¶ 2.

However, it is not enough for the Engagement Letter to state that the Retainer is a classic

retainer. *See* Richmond, *supra*, at 141 (examining language almost identical to that used in the

Engagement Letter and concluding that it was not a classic retainer because "[c]alling an evergreen

retainer something else changes neither its character nor its financial effect"). For example,

immediately after identifying the Retainer as a "classic" retainer, the Engagement Letter states that

> [t]he initial amount of the classic retainer was set to approximate [RSS's] estimate
> of fees and expenses expected to be accrued and unpaid by the [Debtors] between
> payment cycles. [RSS's] estimate of expected fees and expenses may change based
> upon actual or expected fees and expenses incurred or expected to be incurred, as
> applicable. Further, the [Debtors] agree[] to replenish the classic retainer upon
> receiving invoices from [RSS] so that the classic retainer amount remains at or
> above [RSS's] estimated fees and expenses expected to be accrued and unpaid by
> the [Debtors] between payment cycles.

Engagement Letter at 2. Therefore, by the express terms of the Engagement Letter, the parties

contemplate that the Retainer would be reduced by the payment of future fees and expenses and

then replenished as needed. In contrast, a classic retainer is not reduced by future expenses, but rather merely secures an attorney's availability. *See Kelly*, 2 F. Supp. 2d at 446. Furthermore, although a classic retainer is a payment to ensure the assistance of an attorney or firm, the Engagement Letter explicitly states that the retention can be terminated at any time by RSS. Engagement Letter at 2. Giving full weight to all the terms of the Engagement Letter, the Court finds that the Retainer was not a classic retainer.

Next, the Court considers whether the Retainer is an advance payment or fixed fee retainer. The Engagement Letter contemplates that "[t]he initial amount of the [Retainer] was set to approximate [RSS's] estimate of fees and expenses expected to be accrued and unpaid by the [Debtors] between payment cycles." Engagement Letter at 2. Further, under New York law, all advance payments are treated as an advance payment retainer "absent a 'security retainer' being specifically created in the retainer agreement." *See Ruberto*, 913 N.Y.S.2d at 891.

Examination of the Engagement Letter and Retention Order, however, reveals that the Retainer is not an advance payment or fixed fee retainer. As an initial matter, the Retainer was clearly not meant to constitute a fixed payment for future services. Rather, the Engagement Letter is clear that the Retainer is an "estimate" of fees and expenses to be accrued between payment cycles, and RSS's "estimate of expected fees and expenses may change based upon actual or expected fees and expenses incurred or expected to be incurred, as applicable." Engagement Letter at 2. Moreover, the Debtors agreed to adjust the size of the retainer so that it remained at or above RSS's estimate of fees and expenses to be accrued. *Id.* Therefore, rather than being a fixed fee for future services, the Retainer was held by RSS "solely to secure the ability of the client to pay for the services the client expects the lawyer to render in the future." *See In re Dewey & Leboeuf LLP*, 493 B.R. at 429 (quoting *Ruberto*, 913 N.Y.S.2d at 891). This is further confirmed by the Retention

Order, which states that "[t]he Application is granted to the extent set forth herein" and that "[n]otwithstanding anything in the Engagement Letter to the contrary, [RSS] shall apply its prepetition retainer as a credit toward postpetition fees and expenses, after such postpetition fees and expenses are approved pursuant to an order of the Court awarding fees and expenses to [RSS]." Retention Order ¶¶ 1, 5. Pursuant to the terms of the Retention Order entered by this Court, the Retainer was merely a credit to future fees, and ownership of the Retainer did not pass to RSS until after the fees and expenses were approved by the Court. The Court finds that the Retainer was property of the Debtors' estates as of the Petition Date, notwithstanding language in the Engagement Letter claiming that the Retainer was earned by RSS upon receipt. *See* Engagement Letter at 2.

The Chapter 7 Trustee asserts that the Retainer Balance of approximately $15,093.35 is property of the bankruptcy estates and therefore should be turned over to her for the benefit of the chapter 7 estates. Furthermore, the Chapter 7 Trustee contends that the entire $70,000 Retainer is ultimately subject to the distribution priorities under section 726(b) of the Bankruptcy Code and therefore reserves her right to seek disgorgement of all fees paid to date "in the event that the Chapter 7 priority claims remain unpaid." Motion to Compel ¶¶ 3, 6, and 10.

### Conclusion

Based on the foregoing, the Court finds that RSS violated the disclosure requirements under Rule 2014 and section 329 of the Bankruptcy Code in failing to disclose its relationships with Sam Kim, his wife, and On Five. Moreover, the Court finds that the Retainer is property of the chapter 7 debtors' estates. The Court denies the Chapter 7 Trustee's request to disqualify RSS, but will impose sanctions on RSS for its failure to meet the disclosure mandates of the Bankruptcy Code and Rules.

In chapter 7 cases, the timing of distributions for administrative expense payments, other than at the close of the case, is within the discretion of the Court. *In re King*, 392 B.R. at 68 (citing *Varsity Carpet Serv. v. Richardson (In re Colortex Indus., Inc.)*, 19 F.3d 1371, 1384 (11th Cir. 1994) (holding that due to the existence of higher priority claims, it was within the discretion of the court to delay payment of administrative expenses)). In cases like this one, where the Debtors may be administratively insolvent, the exercise of that discretion is informed by the application of the priority of estate distributions under chapter 7 of the Bankruptcy Code. Where, as here, the chapter 7 cases have not been fully administered, and may be administratively insolvent, it is premature to finally adjudicate the merits of the Fee Application, or to consider awarding additional interim compensation. As to the latter, that is particularly so, given the Court's determination that the Retainer is not property of the chapter 7 debtors' estates. It is also premature to direct the turnover of the Retainer Balance, to consider the appropriate sanction for RSS's failure to comply with its disclosure obligations under Rule 2014 and section 329 of the Bankruptcy Code, or to determine whether RSS should be compelled to disgorge fees paid to date. Accordingly, the Court adjourns further consideration of the Fee Application, the Motion to Compel and Motion to

Disgorge until such time that the final estates of Level 8 and WCC can be adequately measured,

and distributions can be made.

**IT IS SO ORDERED.**

Dated: New York, New York
      April 13, 2023

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge